IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARY ANN MOORE,                    )
                                   )
            Plaintiff,             )
                                   )    No. 13 C 7843
vs.                                )
                                   )    Magistrate Judge Schenkier
CAROLYN W. COLVIN, Acting          )
Commissioner of Social Security,   )
                                   )
            Defendant.             )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Mary Ann Moore filed a motion for summary judgment seeking reversal or remand of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB") under Sections 216 and 223 of the Social Security Act (doc. # 15). The Commissioner filed her own motion seeking affirmance of the decision denying benefits (doc. # 22). For the following reasons, we grant Ms. Moore's motion, deny the Commissioner's motion, and remand the case for further consideration consistent with this Memorandum Opinion and Order.

### I.

We begin with the procedural history of this case. Ms. Moore applied for DIB on June 30, 2010, alleging as her various disabilities chronic depression: carpal tunnel syndrome, cervical radiculopathy, and ankle and knee pain (R. 141-47). Ms. Moore alleged the date of

---

[1] On August 26, 2013, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (docs. ## 19, 20).

January 5, 2009 as her onset date (R. 141). The application was denied initially on October 12, 2010 and upon reconsideration on April 20, 2011 (R. 89-96, 103-05). On timely request, a hearing was held before Administrative Law Judge ("ALJ") Mario G. Silva on June 13, 2012 (R. 49-88). The ALJ issued an unfavorable decision on June 28, 2012, finding that Ms. Moore is not disabled but rather is capable of light, unskilled work with certain modifications (R. 31-43). The Appeals Council then denied Ms. Moore's request for review, making the ALJ's ruling the final decision of the Commissioner (R. 28-30). *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We proceed with a summary of the administrative record. Part A briefly sets forth Ms. Moore's background, followed by her physical and mental health medical record in Part B. Part C discusses the testimony provided at the hearing before the ALJ, and Part D sets forth the ALJ's written opinion. Part E discusses additional documentation Ms. Moore submitted to the Appeals Council following the ALJ's determination.

## A.

Ms. Moore was born on January 13, 1959, and has a high school education (R. 157, 162). She has one grown son and during the relevant time period lived alone in a mobile home (R. 171). Between December 1987 and January 2009, Ms. Moore worked as a polisher of commercial-grade sinks (R. 162). She has not engaged in significant gainful activity ("SGA") since she was laid off from that job on January 5, 2009 (*Id.*). Following ALJ Silva's denial of DIB, Ms. Moore reapplied for benefits and was granted DIB as of December 24, 2013 (Pl.'s

2

Mot. Summ. J. ("Pl.'s Mot.") (doc. # 15) at 2). Accordingly, the period of time now under review by this Court is January 5, 2009 through December 23, 2013 (*Id.*).[2]

**B.**

The relevant medical record begins on April 9, 2002, when Ms. Moore arrived at Advocate Oak Park Health Center complaining of alopecia (hair loss) and depression causing crying spells, anxiety, and sadness (R. 248-49). Dave Nayana, M.D., discussed various treatments with her, including counseling and medication, but Ms. Moore opted only for medication and was accordingly given a prescription for Paxil, an antidepressant (*Id.*).

Ms. Moore returned to Dr. Nayana for a follow-up on April 23, 2002, at which time she stated that the Paxil was helping her but that she felt she needed a higher dose (R. 273). Dr. Nayana doubled her dosage, from 10 mg to 20 mg (*Id.*). However, at a second follow-up on June 4, 2002, Ms. Moore advised Dr. Nayana that she had stopped taking Paxil every day because it interacted negatively with an allergy medication (R. 252). Dr. Nayana advised her to resume the Paxil as needed (*Id.*).

In February 2004, Ms. Moore sought care from Sinai Medical Group for depression, fatigue, social isolation, and increased alcohol consumption, and she was diagnosed with major depressive disorder (R. 659-60). Ms. Moore attended therapy sessions a few times a year from June 2006 until April 2009 (R. 648-59). A medication log from 2007 indicates that Ms. Moore refilled prescriptions for Cymbalta (for depression) and Xanax (for anxiety) on a monthly basis between January 2007 and February 2008 (R. 294-95).

---

[2]In her motion for summary judgment, Ms. Moore stated that she successfully secured DIB as of December 24, 2013, but neither she nor the Commissioner provided any additional information regarding this matter, including the basis upon which disability was granted.

The medical record from 2007 also reflects the beginning of a long treating relationship with Michael Treister, M.D., an orthopedic and hand surgeon. Ms. Moore first visited Dr. Treister in January 2007 complaining of pain in both wrists and elbows and shooting pain up to her shoulders (R. 296). Ms. Moore advised the doctor that she polished commercial sinks using repetitive movements with the aid of air tools that vibrate and shake (*Id.*). Dr. Treister diagnosed Ms. Moore with "[v]ery severe bilateral carpal tunnel and Guyon's canal syndromes, work related with classic vibratory and repetitive motion abuse," and scheduled her for carpal tunnel and Guyon's canal release surgery at St. Elizabeth's Hospital to repair the left wrist (R. 298). This surgery occurred on January 30, 2007, and was successful: Ms. Moore reported five weeks after the surgery that her left hand was doing "very well," and that she was able to perform light duty work (R. 301).

On March 12, 2007, Ms. Moore had the same surgery on her right wrist (R. 302). She complained of post-operative pain at several follow-up appointments but was able to return to work performing light duty tasks on a part-time basis by early May 2007 (R. 304-11). Dr. Treister indicated that she could continue with light duty work but that her hands were not healed enough to use vibrating hand tools (R. 312).

On July 19, 2007, Ms. Moore followed-up with Dr. Treister, complaining of continued numbness and pain in her hands and left shoulder (R. 313). Dr. Treister indicated that Ms. Moore likely had "longstanding nerve irritation before surgical decompression and most likely has some residual nerve damage/irritation" (*Id.*).

On September 17, 2007, Ms. Moore informed Dr. Treister that she no longer had numbness or pain in either wrist and that she had been doing light duty work (R. 317). Dr. Treister indicated that she could begin doing heavier work provided she avoid air tools and limit

4

lifting to 25 pounds (*Id.*). Ms. Moore reported the next month that she believed she could do "just about everything" at work except use vibrating tools, but that her employer would not let her return to full-time work unless she used air-powered tools (R. 318-19). Dr. Treister charted that Ms. Moore "should be working a full day," but that the air tools would irritate the nerves in her wrists and that she should be limited to lifting up to the moderate range (R. 319).

Ms. Moore returned to Dr. Treister in early 2008. She reported no further elbow pain but some lingering cold sensitivity (R. 320-21). Dr. Treister discharged Ms. Moore from his care, stating that she could gradually begin to use air tools but should discontinue doing so if she experienced symptom recurrence (R. 321).

In March 2008, Ms. Moore returned to Dr. Treister complaining of pain and swelling in both knees that she had been experiencing for some time but had put on the back burner due to other health issues (R. 328). Dr. Treister diagnosed crepitus (popping and cracking sounds), as well as mild degenerative osteoarthritis, with the right knee being more severe (*Id.*). Dr. Treister performed arthroscopic surgery on the right knee on April 29, 2008, which showed "[e]xtensive synovitis of the right knee with grade 1-2 chondromalacia" (inflammation of the underside of the knee cap) (R. 338). Following surgery, Ms. Moore returned to Dr. Treister for periodic follow-ups before being discharged from his care on June 11, 2008 (R. 334). By that time, Ms. Moore indicated that she was doing much better and was starting to feel stronger, although she had some residual stiffness and swelling (R. 333-34). She indicated she was eager to return to work (R. 334).

On May 19, 2010, Ms. Moore was evaluated at Aunt Martha's Health Center complaining of depression, trouble sleeping, and thoughts of self-harm (R. 374). She listed

Paxil, Clorazepam, and Cymbalta as her previous medications (*Id.*). Her health history indicated that alcohol use was a significant issue (R. 376).

Between June and August 2010, Ms. Moore presented twice to a walk-in clinic or emergency room at either Stroger Hospital or Oak Forest Hospital for depression-related symptoms, and three times to these hospitals for upper extremity and neck pain symptoms (R. 439-47—shoulder, neck pain 6/11/10; R. 389-90—depression 6/19/10; R. 448-56—neck pain 7/22/10; R. 391-96—depression 7/30/10; R. 463-71—neck pain 8/16/10). None of those visits resulted in hospitalization.

The next item in the medical record is a report from Jeffrey Karr, Ph.D., a psychologist who examined Ms. Moore on September 15, 2010 (R. 407-10). At that time, Ms. Moore complained of persistent back, shoulder, elbow, arm, neck, shoulder, and hand pain (R. 408). She listed Abilify, Celexa, and Seroquel as her current medications, and Trazadone and Wellbutrin as medications she had discontinued (*Id.*). Ms. Moore admitted to seeking help for depression eight years prior but that she had not continued with treatment thereafter due to financial constraints (*Id.*). She reported several trips to the emergency room for anxiety and depression, but no inpatient history (*Id.*). She admitted to diminished drinking but also to a prior history of blackouts, two arrests for alcohol-related events, and a family history of alcoholism (*Id.*). She attributed her moodiness to the deaths of her father and brother (*Id.*). Dr. Karr noted that Ms. Moore had a heightened affect characterized by rapid, pressured speech, as well as overly verbal, animated answers to questions and occasional tearfulness (R. 409). He found her pleasant, engaged, neatly dressed, and without symptoms of obvious cognitive problems (*Id.*). Dr. Karr diagnosed Ms. Moore with alcohol abuse and a history of substance abuse (*Id.*).

On September 28, 2010, M.S. Patil, M.D., completed an Internal Medicine Consultative Examination of Ms. Moore for purposes of providing information to the Bureau of Disability Determination Service ("DDS") (R. 413-16). Ms. Moore cited as her chief complaints osteoarthritis and cervical radiculopathy that radiated from her neck to her left shoulder blade and then down to her fingers (R. 413). She stated that cortisone injections in her left shoulder and neck in early 2010 did not help and that she had recurrent mild knee and ankle pain that, together with her other ailments, prevented her from climbing stairs, carrying more than 10 pounds, walking more than two blocks, or standing or sitting for more than 30 minutes (*Id*.). Ms. Moore listed her medications as Quetiapine Fumarate (Seroquel), Mapap (acetaminophen), Pravastatin, Abilify, and Lexapro (*Id*.). She informed Dr. Pail that she had been to the Oak Forest emergency room four times over the past year for anxiety and crying spells (R. 416).

Dr. Patil described Ms. Moore as a mildly obese woman in no acute distress with normal speech and gait (R. 414). He found that her "[o]rientation, memory, appearance, and ability to relate during the examination were entirely within normal limits" (*Id*.). He found no difficulty with fine or gross motor movements of her hands and fingers, normal motor strength of her upper and lower extremities, and no deformity, redness, swelling, or tenderness of any joint (R. 416). As for Ms. Moore's complaints of chronic depression and history of substance abuse, Dr. Patil found her "mentation and memory" to be normal at that time (*Id*.).

Donald P. Henson, Ph.D., completed a Psychiatric Review Technique on October 6, 2010 (R. 417-29). He found no severe impairments, but did find a substance addiction disorder (R. 417). Regarding functional limitations, Dr. Henson found Ms. Moore to suffer mild restrictions in the areas of activities of daily living, social functioning, and concentration, persistence or pace (R. 427). He found no evidence of decompensation (*Id*.). During a face-to-face meeting, Dr.

Henson found Ms. Moore to be congruent, coherent, appropriate, pleasant, animated, neatly dressed, and cooperative (R. 429).

Charles Kenney, M.D., completed a Physical Residual Functional Capacity Assessment on October 7, 2010 (R. 431-38). Based on a review of the medical records, he concluded that Ms. Moore is able to lift 50 pounds occasionally and 25 pounds frequently, and can sit, stand and/or walk for six hours out of an eight hour workday (R. 432). He also found her limited as to her ability to push or pull with her lower extremities (*Id.*). He did not find credible her allegations regarding knee pain and restrictions on lifting no more than five pounds (R. 438).[3]

In August 2010, Ms. Moore sought mental health care from Stroger Hospital (R. 478). An initial appointment on August 23, 2010 reflected Ms. Moore's complaint of depression and her medication history of Xanax, Celexa, Cymbalta, Effexor, and Buspar, among other medications related to depression and anxiety (*Id.*). Four months later, Ms. Moore was examined by Dr. Shamina Khattak, a psychiatrist, at which time Ms. Moore complained of confusion regarding her medications and feeling sleepy and tired during the day (R. 477). Dr. Khattak instructed Ms. Moore to take her Abilify at bedtime and added Modafinil, a medication that promotes daytime wakefulness (*Id.*).

Dr. Maria Gragasin, a neurologist with Oak Forest Hospital, examined Ms. Moore on October 27, 2010, and noted complaints of radiating neck, back, and leg pain (R. 476). Dr. Gragasin ordered a CT scan of Ms. Moore's cervical spine, which took place on November 4, 2010 (R. 459). The scan revealed degenerative disk disease throughout the cervical spine, with stenosis noted throughout, ranging from mild to severe (*Id.*). A CT scan of Ms. Moore's lumbar spine performed that same day indicated early degenerative disk disease, mild to moderate

---

[3]This determination was affirmed by DDS consulting doctors James Madison, M.D., and M.W. DiFonso, Psy.D., in April 2011 (R. 496-98).

stenosis, and facet hypertrophic disease (R. 461). Dr. Gragasin examined Ms. Moore again on November 23, 2010 (R. 475). Her impression of Ms. Moore's condition at that time was cervical and lumbar radiculopathy and degenerative disc disease (*Id.*).

At the request of the DDS, Liana Palacci, D.O., performed an Internal Medicine Consultative Examination of Ms. Moore on March 1, 2011 (R. 491-94). Dr. Palacci reviewed medical records received from Oak Forest Hospital, CT scans of Ms. Moore's spine, and a psychiatric note from Cook County Bureau of Health Services reflecting a history of psychiatric disease and the use of Abilify, Celexa, and Seroquel (R. 491). In her examination, Dr. Palacci noted that Ms. Moore was able to squat down, heel-to-toe stand, and walk without an assistive device (*Id.* at 493). She had a full range of motion of the lumbar spine (*Id.*). Mentally, Ms. Moore presented as polite, pleasant, cooperative, and able to speak in a coherent and concise fashion (*Id.* at 494). Accordingly, Dr. Palacci concluded that Ms. Moore has a history of depression but found no objective findings as to her complaints of low back, neck, and knee pain (*Id.*).

On March 2, 2011, Dr. Gragasin completed a Medical Report of Incapacity and a Preliminary Medical Status Report on a form issued by the Thornton Township General Assistance in South Holland, Illinois (R. 484-87). In this report, Dr. Gragasin checked a box indicating that Ms. Moore is permanently disabled due to neck and low back pain caused by degenerative disc disease and spinal stenosis of the cervical and lumbar spine (R. 485). Dr. Gragasin indicated on the form that Ms. Moore's incapacity should be reevaluated after she had been seen by "neurosurgery," but she did not include a time frame for the re-evaluation (R. 486). The form also indicates that Ms. Moore's incapacity began in January 2009 (R. 487).

Ms. Moore was seen numerous times at Stroger Hospital's pain clinic beginning in May 2011. On July 19, 2011, Ms. Moore complained to Dr. Rakhi Dayal, M.D., of low back pain radiating down her right leg, and neck pain radiating down into her left hand (R. 512). Dr. Dayal's examination revealed full muscle strength of upper and lower extremities and good range of motion but tender areas in her left shoulder and lumbar region, as well as reduced sensation in certain fingers (R. 513). Dr. Dayal recommended a facet injection into Ms. Moore's lumbar spine, and this was done on September 12, 2011 (R. 513, 623). An MRI of Ms. Moore's cervical spine performed on November 8, 2011 indicated multilevel disc disease with bilateral neuroforamina and mild spinal canal stenosis (R. 502-03).[4]

On February 5, 2012, Ms. Moore presented to the emergency room of St. Margaret Mercy Hospital complaining of depression and constant crying (R. 519). The diagnoses at that time were listed as suicidal ideation, major depression, and alcohol intoxication (R. 522). Ms. Moore was admitted to the hospital for five days due to intensifying suicidal ideation, and she received a psychiatric evaluation that identified as her criterion for discharge the "cessation of suicidality and the reduction of anxiety and depressive symptoms" (R. 554). Upon discharge, Dr. Edward Navakas, M.D., observed Ms. Moore to have a brightened affect and an absence of anxiety and despondency (R. 551). Dr. Navakas prescribed numerous medications for her to take, including Clonazepam (for anxiety), Seroquel (for depression), Trazodone (for sleep), and Venlafaxine (for depression) (*Id.*).

---

[4]"Neuroforaminal narrowing refers to a reduction in the size of the opening in the spinal column through which the spinal nerve exits. As this opening narrows, the nerve becomes compressed which in turn can lead to pain that radiates along the path of the nerve." http://www.spine-health.com/glossary/neurofooraminal-narrowing. Cervical stenosis refers to compression of the spinal cord in the neck region. *Id.* at spine-health.com/conditions/spinal-stenosis.

Ms. Moore continued to receive care from Stroger Hospital for her depression and physical pain throughout 2012. In March, she had an appointment with Dr. Khattak and complained of "not feeling well . . . the medication is not helping" (R. 638). Dr. Khattak prescribed Clonazepam, Seroquel, Effexor, and Trazodone and diagnosed Ms. Moore with probable major depressive disorder (R. 638-40). In April, Ms. Moore had a follow-up appointment with Dr. Rachel Rubin, M.D., who found her to have normal range of motion, normal strength, no tenderness, no swelling, and a normal gait (R. 627-30). Yet, Dr. Rubin also diagnosed her with worsening radiculopathy and depression with anxiety (R. 629). In May, Dr. Mustafa Yerlioglu, M.D., examined Ms. Moore at the Stroger Hospital pain clinic and found normal muscle strength in all extremities, no sensory deficit to light touch or pinprick, good cervical range of motion, but "[c]ervical facet compression [that] elicit[ed] pain on both sides" (R. 623). Dr. Yerlioglu noted that Ms. Moore had either cervical facet disease or a degenerative cervical spine and spinal stenosis (R. 624).

Dr. Khattak completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) on May 21, 2012 (R. 645-46). She indicated that Ms. Moore "has major depressive disorder [and] is on medications but continues to have difficulty concentrating, [and] feels tired" (R. 645). She also noted that Ms. Moore "gets upset easily [and has] poor coping skills" (R. 646). Dr. Khattak's report contains three areas of evaluation: making occupational adjustments, making performance adjustments, and making personal-social adjustments (R. 645-46). Falling within the "good" category of these three areas were Ms. Moore's ability to follow rules, relate to co-workers, and use judgment (R. 645). Falling within the "fair" category were her ability to function independently, understand/remember/carry out simple job instructions, maintain personal appearance, and relate predictably in social situations (*Id.*). Falling within the

11

"poor/none" category were her ability to deal with the public, interact with supervisors, deal with work stressors, maintain attention/concentration, understand/remember/carryout complex or even non-complex but detailed job instructions, and behave in an emotionally stable manner (*Id.*).

## C.

At the hearing before the ALJ on June 13, 2012, Ms. Moore, her sister, and a vocational expert ("VE") all testified. Ms. Moore's attorney, James Balanoff, began the hearing by identifying his client's severe impairments as carpal tunnel syndrome, Guyon's canal syndrome, degenerative disk disease with radiculopathy, knee and ankle pain, major depression, generalized anxiety, obesity, and hypertension (R. 52-53). Mr. Balanoff identified Ms. Moore's onset date as her last day of work, January 5, 2009 (R. 54).

Ms. Moore testified next. She stated that she worked for 21 years as a polisher of commercial sinks but left her job when she was laid off (R. 58). She admitted she would have worked longer had she not been laid off, but that she was unsure for how long on account of her mental state and poor job conditions (*Id.*). As a sink polisher, Ms. Moore used about seven or eight different vibrating tools (R. 59).

Ms. Moore stated that she had not worked in any capacity since January 2009, although she received unemployment benefits until December 2010 (R. 54-55). During the time she received unemployment benefits, Ms. Moore did not actually seek employment because she felt she "was disabled at that particular time" due to depression, anxiety, and stress (R. 55). Even had she been offered a job, Ms. Moore testified that she could not have accepted it on account of her physical and mental status (R. 71). She also testified that she would have been homeless were it not for the unemployment benefits (*Id.*).

Regarding her physical health, Ms. Moore stated that she had carpal tunnel surgery on both hands in 2007 and that she returned to work after the surgeries (R. 56). Since her surgery, Ms. Moore's hands have improved a great deal but are not "100 percent" (R. 59). Her hands are bothered by the cold, and sometimes they get "locked up" and she drops things (R. 60). After she was laid off, the condition of her hands stayed "about the same," though she believes her hands would have deteriorated had she stayed at work (*Id.*).

Ms. Moore explained that her knees get swollen and she has difficulty walking (R. 60). She takes ibuprofen for the pain and elevates her legs six hours out of eight (R. 60-61). She also lies down frequently (R. 62). She receives spinal injections to help with pain in her back and neck (R. 57). She rated her back pain as an eight on a pain scale of ten (R. 62). She also has pain in her elbows and right ankle (R. 74).

Ms. Moore stated that she has been receiving psychiatric care since 2001, and that she sought help on account of worsening stress and crying spells (R. 66). She cries three or four times a week, often on account of the death of her brother or "[j]ust life in general" (R. 67-68). She has "bad" days three or four times a week when she gets up only for breakfast and then goes back to bed, on and off, for most of the day (R. 68-70). On "good" days she gets up and watches television (R. 69). She gets help from family members with cleaning, grocery shopping, and getting out of the house (R. 69-70). She has a driver's license but no car (R. 69).

Ms. Moore testified that her mental health has declined since she stopped working due to her lack of social skills and her weight gain (R. 57-58). She currently takes Trazodone, Seroquel, Clonazepam, and Venlafaxine (R.74). Her depression medication causes her to feel sleepy throughout the day, and consequently she naps twice during the day (R. 62). For a while, she took a medication called Modafinil, which promotes wakefulness, but the psychiatrist at

Cook County Hospital stopped paying for it so she no longer takes it (R. 63). She does not sleep well at night as her medications cause restlessness and vivid dreams and she awakens "constantly" (R. 64). She estimates that she might sleep four hours out of ten or eleven (R. 65). She suspects, but cannot confirm, that Seroquel causes these side-effects (*Id.*).

Ms. Moore has a history of alcohol consumption and had a DUI arrest in 2000, but she was not convicted (R. 71-72). Ms. Moore stated that she stopped drinking and smoking in February 2012 (R. 72). Prior to that time, she estimates that she got drunk once a week (R. 73).

Ms. Moore's sister, Linda Moore, testified next. She stated that she sees her sister five to six times a month and helps her with grocery shopping, house cleaning, transportation, and pest control (R. 75-76). Their brother also helped with these tasks before his death, which had occurred recently (R. 76). Ms. Linda Moore stated that her sister does not do very much during the day, cries frequently, and complains about "her situation" and "the constant pain in her back and in her neck" (R. 76-77, 79). When asked about her sister's alcohol use, Linda Moore stated that her sister used to become intoxicated several times a week but that she stopped drinking a few months earlier (R. 78). Since then, Linda Moore has found her sister to be more irritable, short-tempered, and uncommunicative (*Id.*).

Finally, Vocational Expert ("VE") Richard Fisher testified. He classified Ms. Moore's former employment as unskilled, medium-level work as defined, but heavy-level work as performed (R. 79). The ALJ then posed the following hypothetical to the VE: assuming an individual of the same age, education and work experience as Ms. Moore; performing light work; lifting up to 20 pounds occasionally and 10 pounds frequently; standing or walking for six hours out of an eight hour workday and sitting for six hours of an eight hour work day; limited to work performed on an even terrain and never climbing ropes, ladders, or scaffolds; occasionally

climbing ramps and stairs; occasionally balancing, stooping, kneeling, and crouching; never crawling; occasionally handling and fingering items; avoiding exposure to moving machinery or unprotected heights; limited to simple, routine, and repetitive work that is isolated from the public with only occasional interaction with co-workers or with supervisors; limited to work that involves only simple, work-related decisions and routine workplace changes; and limited to work that does not involve work requiring the management of others or abstract planning or thought—would such a hypothetical worker be able to perform Ms. Moore's past work? (R. 80-81). The VE responded in the negative (R. 81). The ALJ then asked whether such a hypothetical worker could perform other jobs in the regional or national economy, and to this question the ALJ responded affirmatively—that the worker could perform the job of mail clerk, routing clerk, or marker (*Id.*). At this unskilled level of work, the employer tolerance for absences is one day per month, both excused and unexcused (R. 81-82). Arriving later or leaving early is treated the same as an absence (R. 82). Finally, employer tolerance for being off-task is limited to an extra ten or fifteen minute unscheduled break for a legitimate reason (*Id.*).

Ms. Moore's attorney then asked the VE whether a person who had been deemed without "useful ability" to deal with the public; interact with supervisors; deal with work stresses; maintain attention or concentration; understand, remember, and carry out complex or detailed job instructions; or behave in an emotionally stable manner could work any of the three jobs identified by the VE: mail clerk, routing clerk, or marker, or any other job (R. 82). The ALJ asked for clarification as to what "no useful ability" meant, and the attorney suggested that it meant "[u]nable to interact appropriately" and "[u]nable to attend to task" (R. 84). To this, the ALJ responded that the hypothetical person would be unable to perform any of the identified jobs (R. 83).

The attorney posed a second hypothetical to the VE: whether someone could perform the three identified jobs if, due to depression, she were prone to crying for long periods of time (R. 84). The VE responded that a worker who cried on the job would not be able to attend to the tasks required by the jobs (R. 85). The hearing ended with Ms. Moore's attorney making arguments to explain why Ms. Moore should not be denied disability benefits due to her acceptance of unemployment benefits, despite her admitted unwillingness or inability to accept a job, or due to her alcohol consumption (R. 87).

**D.**

On June 28, 2012, the ALJ issued a 13-page, single-spaced written opinion finding Ms. Moore not disabled pursuant to sections 216(i) and 223(d) of the Social Security Act and consequently denying her benefits (R. 31-43). In evaluating the claim, the ALJ applied the five-step sequential process detailed in 20 C.F.R. § 404.1520(a)(4), which required him to analyze whether the claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment that meets or equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform her past work; and (5) is capable of performing other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If the ALJ finds at Step 3 that the claimant has a severe impairment that does not equal one of the listed impairments, she must assess and make a finding about the claimant's Residual Functional Capacity ("RFC") before moving on to Step 4. *See* 20 C.F.R. § 404.1520(e). The ALJ then uses the RFC at Step 4 to determine whether the claimant can return to her past relevant work; if not, the ALJ proceeds to Step 5 to determine whether the claimant can return to different available work in the national economy. *See Id.* at § 404.1520(e)-(g). The

claimant bears the burden of proof at Steps 1 through 4, but the burden shifts to the Commissioner at Step 5. *See Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

At Step 1, the ALJ found that Ms. Moore has not engaged in substantial gainful employment since her alleged onset date of January 5, 2009 (R. 33). At Step 2, he found that Ms. Moore's "status post bilateral carpal tunnel release surgery, status post right knee surgery with residual degenerative joint disease, bilateral Guyon's syndrome, degenerative disc disease of the lumbar and cervical spine, obesity, anxiety, depression and a history of alcohol abuse" qualified as severe impairments, but then found at Step 3 that these impairments did not meet or medically equal any of the impairments listed in the Listing of Impairments (R. 33-34). The ALJ then found that Ms. Moore had an RFC that permitted her to perform light work with various limitations (R. 34-35). At Step 4, the ALJ found that Ms. Moore could not perform her prior work, but at Step 5 he found that there was other work she could perform. Accordingly, the ALJ found Ms. Moore not disabled.

### E.

Following the ALJ's decision, Ms. Moore submitted additional documents to the Appeals Council (R. 26). These documents reflect a visit to Stroger Hospital's pain clinic on June 20, 2012, during which Ms. Moore complained of neck, shoulder, elbow, knee, and ankle pain, as well as moderate swelling in her legs (R. 745). Mustafa Yerlioglu, M.D., identified left cervical facet disease as Ms. Moore's diagnosis and performed a left cervical epidural injection on July 25, 2012 (R. 736).

Dr. Khattak examined Ms. Moore on July 23, 2012, and noted her complaints of anxiety and depression and her stated belief that her medication was not working (R. 741). The medical notes from that visit reflect Ms. Moore's medications as BuSpar, Effexor, Seroquel,

Clonazepam, Hydrochlorothiazide, ibuprofen, Methocarbamol, Naproxen, Trazodone, and Venlafaxine (R. 742). Also listed as "documented medications" were Celexa, Neurontin, Amitriptyline, Baclofen, and Citalopram (R. 743). Dr. Khattak diagnosed Ms. Moore with recurrent, probable major depressive disorder (*Id.*).

On October 3, 2012, Ms. Moore visited the urgent care clinic complaining of worsening chronic knee pain (R. 773). Jorge Saad, M.D., diagnosed Ms. Moore with exacerbation of chronic knee arthritis (R. 774). An x-ray of Ms. Moore's left knee later that month showed "prominent degenerative joint changes of the patellofemoral joint" (R. 782). Ms. Moore returned to the Stroger outpatient pain clinic on December 13, 2012, and at that time received injections into both knees for her osteoarthritis (R. 772).

Ms. Moore visited the rheumatology outpatient clinic on May 31, 2013, complaining of neck, back, and knee pain (R. 750-55). Naser Yamani, M.D., diagnosed her with degenerative joint disease and osteoarthritis (R. 754). Dr. Yamani noted Ms. Moore's history with the pain clinic and opined that much of her pain stems from fibromyalgia (*Id.*). Further, Dr. Yamani noted that "normally we use[ ] medications such as amitriptyline but she already is on too many centrally acting medications" (*Id.*).

Finally, the additional medical records contain several medical evaluations/physician reports completed in late December 2012 and early January 2013 by Drs. Rachel Rubin (internal medicine) and Samina Khattak (psychiatry) on forms issued by the State of Illinois Department of Human Services (R. 767-72). These doctors diagnosed Ms. Moore with severe osteoarthritis, radiculopathy, major and recurrent depression, and anxiety (*Id.*). During this same time period, Dr. Rubin filled out a Medical Report of Incapacity wherein she checked boxes reflecting her opinion that Ms. Moore is permanently disabled (R. 763-65).

18

The Appeals Council denied Ms. Moore's request for review on July 29, 2013 (R. 19-22).

## III.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision. *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013). This Court's role in disability cases is limited to reviewing whether the ALJ's decision is supported by substantial evidence. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and his conclusion, but not necessarily to provide a thorough written evaluation of every piece of evidence in the record. *Pepper*, 712 F.3d at 362. In asking whether the ALJ's decision has adequate support, this Court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

Ms. Moore contends that the ALJ erred in formulating her RFC and raises many arguments in support of that contention, including that: (a) the ALJ failed to follow the "treating physician rule;" (b) failed to consider her medications; and (c) failed to assess her obesity as part of the RFC. Ms. Moore also asserts that the ALJ's credibility assessment is deficient for failing to consider the side-effects of her medications, placing excessive weight on her receipt of unemployment benefits, and overstating her ability to engage in activities of daily living. Additionally, Ms. Moore contends that the ALJ's Step Five determination is erroneous as the evidence shows that she would not be able to perform any work on account of her crying spells and other problems not adequately accounted for in the RFC. For the reasons stated below, we agree that substantial evidence does not support the ALJ's decision.

## A.

As part of her multi-faceted RFC argument, Ms. Moore first argues that the ALJ improperly afforded little weight to the opinions of her treating physicians, Drs. Gragasin and Khattak. We address that argument as to each treater in turn.

## 1.

Ms. Moore first argues that the ALJ erroneously evaluated Dr. Gragasin's opinion (Pl.'s Mem. at 7). Dr. Maria Gragasin of Oak Forest Hospital twice examined Ms. Moore in the fall of 2010. In March 2011, she also completed a Medical Report of Incapacity and a Preliminary Medical Status Report in connection with Ms. Moore's application to Thornton Township General Assistance, a locally-administered welfare program."[5]  In her report, Dr. Gragasin deemed Ms. Moore "permanently disabled" and limited to sedentary work from January 2009 onwards due to neck and low back pain caused by degenerative disc disease and spinal stenosis (R. 487). The ALJ discounted this report, noting that Dr. Gragasin's "dramatic" limitations regarding Ms. Moore's capabilities were made for a different governmental agency, in this case the State of Illinois Department of Human Services, and thus were not binding upon the Social Security Administration (R. 38). Further, the ALJ dismissed Dr. Gragasin's statement that Ms. Moore is limited to sedentary work as being "wholly inconsistent" with the findings of other medical examiners.

The opinion of a treating source physician is entitled to controlling weight, provided it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the case record.  20 C.F.R. § 404.1527(c)(2);

---

[5]*See* http://thortontownship.com/services/general-assistance.

*Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011).[6] An ALJ may discredit a treating source's medical record, however, if it is internally inconsistent or inconsistent with the opinion of a consulting physician—provided the ALJ minimally articulates her reason for crediting or rejecting evidence of disability. *See Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). A decision to deny controlling weight to a treating source's opinion does not prevent the ALJ from considering it; the ALJ may still look to the opinion, even after opting to afford it less evidentiary weight. Exactly how much weight the ALJ affords a treating source opinion that he finds non-controlling depends on a number of factors, such as the length, nature, and extent of the physician's and claimant's treatment relationship, whether the physician supported his or her opinions with sufficient explanations, and whether the physician specializes in the medical conditions at issue. *See* 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3), (c)(5); *Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013) (setting forth factors to be considered when evaluating the weight to be given a treating doctor's opinion).

Here, the ALJ dismissed Dr. Gragasin's conclusion that Ms. Moore is "permanently disabled" on the basis that he is not bound by a disability determination of another governmental or nongovernmental agency—in this case Thornton Township General Assistance. *See* 20 C.F.R. § 404.1504. However, we find the ALJ's reliance on this statute to be unnecessary. In our view, the definitive opinion at issue is Dr. Gragasin's, not Thornton Township's, and so we find that the ALJ should have focused more intently on SSR 96-5p, which is operative when a

---

[6]A "treating source" is defined as a "physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. Conversely, a non-treating source is "a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you." *Id.* From our review of the medical record, it appears that Dr. Gragasin examined Ms. Moore only twice prior to the time she prepared the March 2011 report, and it does not appear that Ms. Moore had an on-going treatment relationship with this doctor thereafter. However, the Commissioner does not argue that Dr. Gragasin is a non-treating physician; accordingly, the Court proceeds under the assumption that Dr. Gragasin is a treating source physician.

treating source opines on issues that are reserved to the Commissioner, such as whether an individual is "disabled," as defined by the Social Security Act. SSR 96-5p, 1996 WL 374183 (S.S.A. July 2, 1996). SSR 96-5p makes clear that that although such opinions are "never entitled to controlling weight or special consideration," the ALJ nevertheless must still "evaluate all evidence in the case record that may have a bearing on the determination or decision of disability." *Id.* at *2.

In this case, rather than carefully evaluate the specific ways in which Dr. Gragasin's opinion was at odds with the medical record, the ALJ simply concluded that Dr. Gragasin's findings were "wholly inconsistent with the medical evidence, the clinical findings of two consultative medical examiners, as well as multiple treating physicians such as Dr. Rubin, all of which shows little, if any, change in the claimant's condition before and after she lost her job in January 2009" (R. 38). This thinly developed discussion is insufficient. Indeed, there is evidence in the medical record that is at odds with the ALJ's conclusion that the medical record shows little, if any, change in Ms. Moore's condition after 2009. The medical record contains evidence of Ms. Moore's psychiatric-based, five-day hospitalization in 2012, as well as a significant number of entries beginning around 2012 reflecting complaints of increasing pain with her knees, neck, and back, and diagnoses of degenerative joint disease and osteoarthritis. In our view, the ALJ improperly overlooked evidence that was contrary to his findings. *See Bates v. Colvin,* 736 F.3d 1093, 1099 (7th Cir. 2013) ("An ALJ cannot rely only on the evidence that supports her opinion.").

Further, we find problematic the ALJ's failure to specifically identify the two consultative medical examiners upon whose opinions he purportedly relies. We recognize that DDS examining physician Dr. Patil, for example, found Ms. Moore's mental status examination

to be normal and lacking tenderness, swelling, or deformity as to any joint, but we remain uncertain as to whether the ALJ relied on this DDS examination or different ones because he failed to specifically identify them. *See Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2000) (an ALJ must minimally articulate his analysis "with enough detail and clarity to permit meaningful appellate review"). As for consultative examiner Dr. Rubin, she did note that Ms. Moore presented as cooperative, appropriate, alert, oriented, and with a normal range of motion and strength, yet she also noted diagnoses of radiculopathy that was "not improving" and "depression with anxiety" (R. 629). Dr. Rubin further observed that Ms. Moore had current prescriptions for Seroquel, Trazodone, Clonazepam, and Venlafaxine, all of which are strong psychiatric medications (R. 628).[7] We thus are unclear how Dr. Rubin's report "wholly" supports the ALJ's findings.

In addition, we find that the ALJ did not consider the checklist items enumerated in 20 C.F.R. § 404.1527(c)(2)-(6) when evaluating the weight to be afforded Dr. Gragasin's opinion. These items include, but are not limited to, the length, nature and extent of the plaintiff's and

---

[7]Seroquel is known as an "adjunctive" (add-on) medication prescribed for treatment-resistant depression or for patients who have unresolved symptoms. Seroquel is often prescribed along with anti-anxiety medications, antipsychotics, or mood stabilizers. *http://www.drugs.com/newdrugs/fda-approves-seroquel-xr-add-major-depressive-disorder-1798.htm*. Trazodone is an antidepressant from a class of medications knows as serotonin modulators and has the known side-effect of drowsiness, so it is often used as a countermeasure for insomnia. http://www.consumerreports.org./cro/2012/04/trazodone-common-sleep-drug-is-little-known-antidepressant/index.htm. Clonazepam is in a group of drugs called benzodiazepines and is used to treat seizures and panic disorders. http://drugs.com/clonazepam. It can cause suicidal thoughts and should not be consumed with alcohol. *Id*. Venlafaxine, sometimes known by its brand name Effexor, is from a group of drugs called serotonin and norepinephrine reuptake inhibitors (SNRIs) and is used in the treatment of major depressive disorder, generalized anxiety disorder, panic disorder, and social phobia. http://www.mayoclinic.org/drugs-supplements/venlafaxine-oral-route/description/drg-20067379. Common side-effects include insomnia or drowsiness, among others. http://www.livestrong.com/article/23167-effexor-side-effects-insomnia/.

physician's treatment relationship, the degree to which the opinion is supported by evidence, the opinion's consistency with the record as a whole, whether the doctor is a specialist, and the types of tests performed. *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (finding that the checklist items are to be used when a physician's opinion is not given controlling weight).

The ALJ must provide the Court with a sound basis for evaluating his decision to discount Dr. Gragasin's findings. *See Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (ALJ must "offer 'good reasons' for discounting" the opinion of a treating physician) (citations omitted). SSR 96-5p and Section 404.1527(c)(2)-(6) dictate a more thorough analysis than that provided by the ALJ.

## 2.

We turn next to Dr. Samina Khattak, a psychiatrist who treated Ms. Moore at Stroger Hospital in 2010 and 2012 for depression. The ALJ generally agreed with many of Dr. Khattak's findings, including her determination that Ms. Moore had poor to no ability to understand, remember and carry out complex and detailed job instructions (R. 40). However, the ALJ discounted Dr. Khattak's finding that Ms. Moore had poor to no ability to interact with supervisors, deal with work stresses, maintain attention/concentration, and behave in an emotionally stable fashion (*Id.*). The ALJ found that Ms. Moore's work history suggested that she was able to do these things because she did so until she was laid off in January 2009 (*Id.*). Additionally, the ALJ found it "evident that the claimant's admission [to the hospital in 2012] was the result of an acute increase in alcohol consumption in reaction to the claimant's difficulty in coping with the terminal diagnosis" of her brother, and further that "[o]ne acute incident after years of stability with minimal treatment, combined with the claimant's demonstrated ability to

work with her mental health conditions," failed to support the limitations proffered by Dr. Khattak (*Id.*).

We agree with Ms. Moore that the ALJ "was inappropriately selective in choosing the evidence" on which to discount parts of Dr. Khattak's report. *Scrogham*, 765 F.3d at 698. The treatment notes from the February 2012 hospital admission indicate that Ms. Moore was intoxicated upon arrival. But that was not the sole basis for admission; other major components of Ms. Moore's hospital admission were her "poor coping skills," "suicidality," and "major depression" (R. 520-21). The ALJ's exclusive focus on the alcohol intoxication element of Ms. Moore's condition at the time of hospitalization—without also noting, for instance, that Ms. Moore was taking four strong antidepression or anti-anxiety medications at the time of admission (Clonopin, BuSpar, Seroquel, and Celexa), or that she was crying frequently and having "off and on suicidal thoughts without plans"—constitutes an impermissible "sound bite" approach to evidence evaluation. *Id.*; *see also Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

Additionally, we disagree with the ALJ's conclusion—also made while evaluating Dr. Khattak's report—that Ms. Moore's medical history demonstrates "years of stability" (R. 40). Ms. Moore may not have had numerous hospitalizations such as the one that occurred in 2012, but the medical record certainly contains documentation beginning in 2010 reflecting her accelerating complaints of depression and anxiety, for which she received many prescriptions for strong medication intended to treat these symptoms. The ALJ appears to view the term "stability" very broadly—perhaps even to encompass any state of mind that falls short of decompensation.

In a similar vein, we disagree with the ALJ's repeated suggestion that Ms. Moore's ability to work up until the time she was laid off in January 2009, notwithstanding her "mental health conditions," translated into Ms. Moore's continued ability to perform light work up through the date of the ALJ's opinion in June 2012. While Ms. Moore admitted she was laid-off in 2009 and that she probably would have continued working had her job not been terminated, she also stated at her hearing that she did not know how much longer she would have been able to work because her "mental issues were getting to the point where sometime[s] [she] would be at work and have to call the psychiatrist, because [her] mental issues were really breaking down" (R. 58). Furthermore, the record reflects that Ms. Moore's sought out medical assistance for her mental health problems to a much greater extent beginning in May 2010. We do not conclude that Ms. Moore was disabled by her mental condition, but we do find that the ALJ did not sufficiently explain or support his conclusion that Ms. Moore's mental health condition reflected "years of stability." The ALJ also failed to create a logical bridge from his finding of Ms. Moore's "simultaneous work and treatment history" in 2009 to his conclusion that she could continue to work continuously from then through 2012. *See Shauger v. Astrue,* 675 F.3d 690, 697–98 (7th Cir. 2012) (remanding case where ALJ failed to build a logical bridge between the evidence and the conclusion that the claimant's testimony was not credible).

For these reasons, we find the ALJ's evaluation of Dr. Gragasin's and Dr. Khattak's reports to be inadequate and thus a basis for remand.

## B.

Next, Ms. Moore argues that her allegations of disabling limitations are credible and reasonably related to medically determinable impairments, but that the ALJ failed to properly evaluate the objective medical evidence, including her medications and her activities of daily

living. The ALJ found that Ms. Moore had numerous severe impairments, including both physical and mental ailments, but that these impairments did not preclude all work (R. 33). Among the considerations influencing this determination were the ALJ's findings that Ms. Moore was actually laid off from work on the date she claims as her onset of disability date; Ms. Moore's testimony that she probably would have continued to work had she not been laid off; her "long history" of working while receiving treatment for depression and anxiety; her ability to return to school in January 2009; and statements Ms. Moore made to Dr. Jeffrey Karr in September 2010 regarding her use public of transportation and her ability to prepare meals, drive, and use a computer (R. 39).

In assessing a claimant's credibility when the allegedly disabling symptoms may not be objectively verifiable, an ALJ must first determine whether those symptoms are "consistent with the objective medical evidence and other evidence." 20 C.F.R. 404.1529(a); SSR 96-7p, 1996 WL 374186, at *2 (S.S.A., July 2, 1996); *Arnold v. Barnhard*, 473 F.3d 816, 822 (7th Cir. 2009). If not, SSR 96-7p requires the ALJ to "consider the entire case record and give specific reasons for the weight given the individual's statements." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (quoting SSR 96-7p). The ALJ should look to a number of factors to determine credibility, including "the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.'" *Id.* (citing 20 C.F.R. § 404.1529(c)(2)-(4)).

ALJs are in the best position to evaluate a witness's credibility, and their assessment will be reversed only if "patently wrong." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). That means that this Court will not substitute its judgment regarding the claimant's credibility for the ALJ's, and that Ms. Moore

"must do more than point to a different conclusion that the ALJ could have reached." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). That said, an ALJ must connect his credibility determinations by an "accurate and logical bridge" to the record evidence. *Ribaudo v. Barnhart,* 458 F.3d 580, 584 (7th Cir. 2006); *see also Sayles v. Barnhart,* No. 00 C 7200, 2001 WL 1568850, at *7 (N.D. Ill. Dec. 7, 2001) (Schenkier. J.) (finding a particular need to establish logical bridge in credibility determinations).

We turn first to the ALJ's treatment of Ms. Moore's medications. One of the more notable deficits in the ALJ's opinion is the near complete lack of evaluation regarding Ms. Moore's depression and anxiety medication and associated symptomology. Throughout his opinion, the ALJ mentioned only one medication (Clonazepam) once, and he did so in the context of noting that upon discharge from the hospital in February 2012, Ms. Moore's anxiety "was absolutely quelled with very minimal clonazepam" (R. 39). However, we note that the discharge notes from that day also indicate that Ms. Moore received a primary diagnosis of "[m]ajor depression, recurrent, severe with suicidality," and that she was discharged with prescriptions for four medications: Venlafaxine (Effexor), Seroquel, Trazodone, and Clonazepam (R. 551). So while the ALJ is correct in noting that Ms. Moore was doing well on the day of her release from the hospital, it is still significant that she required four major medications to combat her feelings of depression and anxiety.

We also recognize that Ms. Moore had recurring prescriptions for anti-depression and anxiety medications beginning years earlier: indeed, the record reflects prescriptions for Paxil, Xanax, and Cymbalta as early as 2002 and 2007. Furthermore, the quantity of medications prescribed to Ms. Moore increased significantly beginning in 2010. Ms. Moore visited Aunt Martha's clinic on June 22, 2010, and reported to the medical staff that she had taken Trazodone

and Citalopram (Celexa) (R. 379). The next month, she received prescriptions from Aunt Martha's clinic for Celexa, Abilify, and Seroquel (R. 396). Upon her discharge from her inpatient hospital stay in February 2012, Ms. Moore was again prescribed numerous prescription medications. *See* footnote 7, *supra*. The fact that Ms. Moore's physicians consistently prescribed multiple, strong, medications indicates that they believed Ms. Moore's symptoms to be significant. *See Scrogam*, 765 F.3d at 701 (claimant's taking of "heavy doses of strong drugs" indicates that the claimant's complaints of pain likely were credible); *Carradine*, 360 F.3d at 755 (finding improbable that medical workers would prescribe drugs for someone faking her symptoms). Accordingly, the medical record does not support the ALJ's conclusion that "all of the claimant's most significant medical events, including her history of depression and alcohol abuse, predate the claimant's onset date, in some cases by years, during which time the claimant continued to perform medium-heavy exertional work" (R. 41).

The ALJ also failed to discuss the side-effects Ms. Moore experienced from her medications, including daytime drowsiness, nighttime insomnia, and bad dreams. The Commissioner argues that the record does not suggest that Ms. Moore suffered from "significant medication side effects" or "instances of . . . reporting significant side effects during medical visits (Def.'s Mot. Summ. J. at 12), but there is evidence in the record suggesting otherwise. On July 30, 2010, Ms. Moore complained to doctors at Stroger Hospital of fatigue, excessive sleep, and decreased concentration (R. 395). On August 23, 2010, Ms. Moore told Dr. Khattak that she was anxious, having trouble learning, had a short attention span, felt tired and unmotivated, and had social phobia (R. 478). On October 25, 2010, Ms. Moore complained of being "confused" about her medications and of being tired and sleepy during the day (R. 477). Consequently, Dr. Khattak changed the timing of her Abilify prescription to bedtime and added Modafinil to her

regimen (*Id.*). Accordingly, we find that Ms. Moore did in fact complain of conditions that may have been side-effects of medication, even if she did not specifically identify her problems as such. *See Terry v. Astrue,* 580 F.3d 471, 477 (7th Cir. 2009) (noting that "we are skeptical that a claimant's failure to identify side effects undermines her credibility"). Because we find that the ALJ insufficiently addressed Ms. Moore's use of medications, including the type, dosage, effectiveness and side-effects, we conclude that the ALJ's adverse credibility determination is not supported by the record. For this additional reason, remand is appropriate. *See Id.* at 478; *Ribaudo v. Barnhart,* 458 F.3d 580, 584–85 (7th Cir. 2006) (remanding where ALJ's adverse credibility determination was not supported by record).

## C.

Ms. Moore raises numerous other issues on appeal that also go to the RFC determination, including the ALJ's treatment of her obesity, her activities of daily living, her alcohol consumption, and the weight the ALJ afforded Ms. Moore's acceptance of unemployment benefits. These challenges do not require discussion in light of our decision to remand the case for further consideration. On remand, the ALJ will have the opportunity to assess these particular matters further, including whether Ms. Moore was disabled as of her alleged disability onset date, or whether she was disabled as of any date subsequent to January 5, 2009, but before December 24, 2013.

## CONCLUSION

For the reasons stated above, this Court grants Ms. Moore's Motion for Summary Judgment (doc. # 15) and denies the Commissioner's Motion for Summary Judgment (doc. # 22). This judgment of the Commissioner is reversed and the case remanded for further proceedings consistent with this Memorandum Opinion and Order. This case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: May 19, 2015